Nathaniel N. Nelson (13307)
Bret W. Rawson (11083)
Nathan Evershed (11280)
**NELSON JONES, PLLC**
8941 South 700 East, Suite 203
Sandy, Utah 84070
(801) 981-8779
nate@nelsonjoneslegal.com
bret@nelsonjoneslegal.com
nathan@nelsonjoneslegal.com

*Attorneys for Plaintiff Courtnee Lewis*

---

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| COURTNEE LEWIS, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>UTAH STATE UNIVERSITY and JOHN<br>and JANE DOEs I-X,<br><br>    Defendants. | **COMPLAINT AND DEMAND<br>FOR JURY TRIAL**<br><br><br>Case No.<br>Judge: |

COMES NOW Plaintiff Courtnee Lewis, by and through NELSON JONES, PLLC and

undersigned counsel, and hereby complains against the above-named Defendants as follows:

### PARTIES

1.      Plaintiff Courtnee Lewis (hereinafter referred to as "Plaintiff" or "Ms. Lewis") is

a resident of the State of Utah and at all relevant times herein was a student at Utah State

University.

2.      Defendant Utah State University (hereinafter referred to as "Utah State" or the

"University") is a public postsecondary educational institution located in Logan, Utah. Utah

State is a political subdivision or entity of the State of Utah and is organized and operated under the laws of the State of Utah and is a recipient of federal funds within the meaning of 20 U.S.C. § 1681.

3.      Defendants John and Jane Does are unknown parties in interest. Plaintiff reserves the right to amend and join such parties when and if their involvement and identities are known.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the parties and subject matter of this action pursuant to, *inter alia*, 28 U.S.C. § 1331 given this litigation involves matters of federal law including claims made under the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq*.

5.      This Court has jurisdiction over Ms. Lewis's state law breach of contract claim pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND

7.      Prior to, during and after the predatory sexual assaults at issue in this case a dangerous environment existed at Utah State where sexual assaults were known about and tolerated by the University.

8.      Utah State failed to properly investigate accusations of sexual assault made by Utah State students against other Utah State students.

9.      Utah State failed to take or implement appropriate measures to ensure all Utah State students were afforded equal access to the University's educational opportunities.

10.     For example, in 2015, a Utah State student was sexually assaulted by another Utah State student, Ryan Wray, during a fraternity party.

11.     After learning of the Wray Incident, Utah State failed to investigate or implement appropriate measures to ensure the safety of other Utah State students and/or prevent similar assaults from occurring.

12.     Wray was convicted of attempted forcible sexual abuse in October 2015.

13.     In addition, sometime prior to July 2015, five women reported being sexually assaulted by another Utah State student, Jason Relopez.

14.     Again, after learning of the reported sexual assaults, Utah State failed to investigate, discipline or otherwise remove Relopez from the University campus to ensure the safety of other Utah State students.

15.     Relopez was convicted of attempted rape and attempted forcible sexual abuse in February of 2016.

16.     It was in the environment described above that at least six female students at Utah State were sexually assaulted, five of whom were raped, by Torrey Green (hereinafter "Green") from November 2013 to November 2015

## GENERAL ALLEGATIONS

*Background on Torrey Green*

17.     Green was a student at USU from approximately 2011 to 2016.

18.     Green was a member of the Utah State football team.

19.     On information and belief, Green was offered and maintained an athletic scholarship with Utah State for the duration of his time at the University.

20.     Following his football career at Utah State, in April 2016 Green signed a contract with the Atlanta Falcons of the National Football League.

21.     Green was subsequently released from the Atlanta Falcons when allegations of sexual assault began to surface.

*Charges and Verdict Against Green*

22.     On or about October 6, 2016, the State began charging Green with several counts of rape, forcible sexual abuse, and/or aggravated kidnapping for incidents occurring while Green was a student at Utah State, and a member of the University's Football Team.

23.     On November 18, 2016, Green was charged in relation to an incident involving Ms. Lewis, which occurred on August 1, 2015.

24.     More specifically, Green was charged with committing the crimes of rape, object rape, and forcible sexual abuse against Ms. Lewis.

25.     Eventually, six (6) separate cases, including eleven (11) different counts, were consolidated and assigned case number 181100491.

26.     Following a jury trial, on January 18, 2019, Green was found guilty of sexually assaulting Ms. Lewis and five (5) other women.

27.     More specifically, Green was found guilty of five (5) counts of rape, including one (1) count of rape against Ms. Lewis, as well as one (1) count of sexual battery, one (1) count of object rape, and one (1) count of forcible sexual abuse.

28.     Of the several crimes for which Green was convicted, the rape of Ms. Lewis occurred nearly last in time, on August 1, 2015.

*Prior Disclosures of Green's Sexual Assaults*

29.     Prior to, and after August 1, 2015, one or more of the aforementioned women reported Green to Utah State.

30.     In October of 2014, another female student, C.D. met Green on Utah State's campus.

31.     Shortly, thereafter, C.D. was raped and sexually assaulted by Green in his apartment.

32.     Upon information and belief, C.D. reported the rape to a professor at Utah State as well as the Utah State's Title IX office.

33.     Utah State failed to investigate Green or implement appropriate remedial action to ensure the safety of other University students.

34.     In January of 2015, another female student, V.G., came into contact with Green on the Utah State campus.

35.     V.G. eventually agreed to meet with Green at his apartment.

36.     After luring V.G. to his apartment, Green sexually assaulted her while they were watching television.

37.     V.G. reported the sexual assault later that same month to her resident assistant, the supervisor of her dormitory complex, and Utah State's SAAVI office.

38.     Upon information and belief, the resident assistant and dormitory complex supervisors reported these accusations to the Utah State Title IX Office.

39.     Officials in the SAAVI office discouraged V.G. from contacting Utah State's Title IX Office directly and told V.G. that if she contacted the Title IX Office, Utah State would take over the investigation and do whatever the Title IX Office wanted, regardless of V.G.'s wishes.

40.     V.G. then reported the sexual assault to the Logan City Police Department.

41.     V.G. left Utah State on or about February 1, 2015 shortly after contacting the SAAVI Office.

42.     Utah State, through its SAAVI Office, its Title IX Office, its resident assistants and dorm supervisors, were aware of the assault perpetrated upon V.G by Green.

43.     Following the incident with V.G. and Green, Utah State failed to investigate Green, implement appropriate remedial action and/or remove Green from the Utah State campus to ensure the safety of its students.

44.     Instead, in the summer of 2015, Utah State renewed, or otherwise failed to revoke Green's athletic scholarship for the upcoming year in order to promote the success and revenue generating ability of the Utah State Football Team.

45.     In June of 2015, another female student, A.P., met Green.

46.     Shortly after A.P. first spoke with Green, and learned that he was a fellow student at Utah State, and a member of the Utah State Football Team, A.P. invited Green to her apartment where he sexually assaulted her.

47.     In October of 2015, A.P. reported the sexual assault to Utah State's SAAVI and Title IX Offices, as well as to Krystin Deschamps.

48.     During the meeting, once Deschamps was made aware that the assailant was a member of the Utah State Football Team, she actively discouraged A.P. from disclosing the name of the perpetrator.

49.     Deschamps told A.P. that if she disclosed the name of her assailant, A.P. would have to be present at every hearing and every disciplinary action that might come about in relation to the disclosure.

50.     Deschamps told A.P. there was no way to make a report anonymously and that Utah State could not protect A.P. from retaliation by her assailant if A.P. reported and disclosed his name.

51.     Deschamps told A.P. that she could instead report to SAAVI who would then report to Deschamps.

52.     Given the active discouragement to prevent disclosure to the Utah State Title IX Office, at the direction of SAAVI officials, A.P. met with an Americans with Disabilities Counselor at Utah State.

53.     During this meeting, A.P. identified Green as the assailant and informed the Utah State Counselor of the nature of the attack perpetrated upon her.

54.     By the time A.P. reported Green, officials at Utah State who had authority to investigate and institute remedial measures on behalf of the University had already received several reports of sexual assaults committed by Green, including but not limited to the reports by C.D. and V.G.

55.     Indeed, when A.P. met with Utah State representatives she was told directly that the University had already received multiple accusations of sexual assault perpetrated by Green.

56.      In November of 2015, another female student and student athlete, R.E., was sexually assaulted by Green.

57.     That same month R.E. reported the sexual assault to Utah State's SAAVI Office as well as the Title IX Office.

58.     Upon information and belief, R.E. had a rape kit performed immediately or soon after the assault and the results of the rape kit were reported to Utah State.

*Failure of Utah State to Investigate or Take Action Against Green*

59.     On January 16, 2016, Eric Olsen and the head coach of the football team, Matt Wells, met with Green concerning allegations of rape.

60.     At the meeting, Olsen and Wells questioned Green about allegations of rape.

61.     Following the January 16, 2016 Meeting, neither Wells, Olsen, nor any person from Utah State conducted the necessary factual investigations into the multiple allegations of sexual assault and rape made against Green.

62.     Indeed, at no point did Utah State actively investigate Green and the accusations made against him.

63.     Despite knowledge that Green was a past and continuing threat to other Utah State students, the University failed to take appropriate action to prevent Green from committing future sexual assaults or otherwise ensure the safety of Utah State students.

64.     Instead, Green was permitted to remain a student at Utah State and to finish his football career, playing in all thirteen games his senior season.

65.     Green was never disciplined, was never removed from campus, was allowed to remain a member of the Utah State Football Team, and was permitted to graduate in May of 2016.

*The Sexual Assault and Rape of Ms. Lewis*

66.     As a consequence of Utah State's inaction and deliberate indifference, Green's pattern of sexual assaults continued and Ms. Lewis was eventually sexually assaulted and raped on August 1, 2015.

67.     Ms. Lewis initially met Green on Tinder where Green held himself out as both a Utah State student and member of the Utah State Football team.

68.     Based on these representations Ms. Lewis agreed to meet Green publicly for ice cream.

69.     After the initial encounter with Green, Ms. Lewis later agreed to go to Green's apartment.

70.     While at Green's apartment, Ms. Lewis was sexually assaulted and raped by Green.

71.     Ms. Lewis reported her assault to Utah State in October of 2016.

*Adverse Effects of the Sexual Assault and Rape of Ms. Lewis*

72.     As a result of the sexual assault and rape, Ms. Lewis suffered severe physical, mental and emotional trauma.

73.     Notwithstanding, Utah State failed to offer or provide Ms. Lewis meaningful access to services required under Title IX following her report of sexual assault against Green and similar reports of several other Utah State students.

74.     Due to Ms. Lewis's inability to obtain necessary assistance, Ms. Lewis eventually transferred to a different university.

75.     As a result of her transfer, Ms. Lewis had to forfeit her full-tuition scholarship at Utah State and incur significant student loans.

76.     Also, as a result of her transfer, Ms. Lewis was prevented from completing one of her chosen majors, as it was not offered at her new university.

*Student Code and Student-Athlete Handbook*

77.     The Student Code prohibited, both on and off campus, "inflicting physical or mental duress, harm, or abuse upon another person including but not limited to verbal abuse,

threats and intimidation, … [and] sexual violence…" *See* Utah State University's Code of Policies and Procedures for Students.

78.     Utah State's Student Code promised that: "Utah State University will not tolerate sexual assault/violence in any form, including incidents which arise in acquaintance and date situations.  Where there is reasonable cause that a sexual assault/violence has occurred, the University will pursue strong disciplinary action, including the possibility of suspension or expulsion from the University." *Id*.

79.     At all relevant times, student-athletes enrolled at Utah State, including Green, were subject to the provisions of the Utah State Student-Athlete Handbook (the "Athlete Handbook").

80.     The Athlete Handbook applied to behavior "both on and off campus" and set forth the following acts as subject to disciplinary action: "[e]ngaging in harassment or unlawful discriminatory activities on the basis of age, ethnicity, gender…"; and any conduct "contrary to the athletics department and university standards…" *See* Utah State's Student Athlete Handbook 2015-2016.

81.     The Athlete Handbook also emphasizes that Utah State, and/or the athletic team to which the athlete belongs, had the power to suspend or entirely dismiss the student-athlete for "any physical or sexual contact that is accomplished against the will of another person." *Id*.

82.     Utah State exercises substantial control over enrolled students on and off campus through its Student Code of Conduct.

83.     Utah State exercises substantial control over student-athletes both on and off campus through its Athlete Handbook.

84.     Indeed, the existence of Utah State's Student Code and Athlete Handbook specifically recognize Utah State's interest, ability, and role in curbing sexual assault, harassment, and violence, both on and off campus.

85.     Further, in Utah State's policy on sexual assault and violence, it expressly commits to "investigate all reported incidents of sexual harassment" and, in cases where evidence form the investigation revealed that sexual harassment, including dating violence and sexual assault, had occurred, to impose appropriate sanctions upon students including suspension from Utah State. *See* Utah State University's Policy on Sexual Harassment.

*Investigation into Utah State's Sexual Violence Prevention Efforts*

86.     In 2016, Utah State initiated an independent third-party investigation into how the University handled reports of sexual violence.  *See* Update on 2016 Recommendations to Improve Sexual Violence Prevention Efforts.

87.     The independent third-party investigation revealed egregious flaws in Utah State's handling of reports of sexual violence that stemmed, in part, from the University's failure to adequately train its employees and adopt inadequate policies.

88.     The investigation found, among other shortcomings:

a.      "The departments responsible for investigating, adjudication, discipline, and advocacy had poor and irregular communication," which contributed to shortcomings in response efforts.

b.      "Multiple responsible employees failed to report information reported to them regarding sexual misconduct."

c. "The manual nature of some recordkeeping systems and the lack of connection between department information systems led to a failure to identify relevant prior records."

d. Due to "inadequate and inconsistent training" employees did not understand their Title IX reporting obligations

e. Inadequacies in the policies and procedures enacted for keeping track of reports led to a failure in responding to reports made.

f. Utah State failed to establish clear procedures and train employees "for how to evaluate whether an investigation should move forward" under certain circumstances.

g. The Student Conduct Office failed to take appropriate actions and this failure prevented certain instances of sexual conduct from being investigated.

89.     In October of 2016, Utah State President Stan L. Albrecht published an "Update on the Recommendations to Prevent Sexual Violence", which stated that following a "targeted inquiry" into how allegations against Green were handled, Utah State "identified places where [the University's] comprehensive system may have fallen short…" and also "identified areas where the University can improve its response to and prevention of sexual violence".

**FIRST CAUSE OF ACTION**
**Violation of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681, et seq. against Utah State University**

90.     Ms. Lewis realleges all preceding paragraphs as if fully set forth herein and incorporates the same by reference.

91.     Utah State exercised significant control over Green because he was a student of the University and a member of Utah State Football Team; as such, the University had significant control over Green via: (i) the Utah State Student Code, (ii) the Student-Athlete Code of Conduct, (ii) the University Sexual Harassment Policy, (iv) athletic scholarships, and (v) the Student-Athlete Sexual Assault and Misconduct Policies.

92.     Utah State, through its employees and administrators, including but not limited to Jenny Erazo, Kristin Deschamps, the SAAVI Office, the Title IX Office, and University resident assistants and dorm supervisors, were on notice of and had actual knowledge of sexual violence and misconduct committed by Green, and the grave risk Green represented to the students at the University *before* the events of August 1, 2015, wherein Ms. Lewis was sexually assaulted and raped by Green.

93.     By its inaction with respect to prior allegations against Green, Utah State created an environment and climate whereby Green's misconduct was tolerated and repeated sexual assaults were encouraged thereby proximately and ultimately causing the sexual assault and rape of Ms. Lewis.

94.     Persons with actual knowledge at Utah State had authority to take action to end Green's behavior and misconduct, but failed to do so.

95.     By its actions and inaction, Utah State acted with deliberate indifference towards the right of Ms. Lewis to a safe and secure educational environment.

96.     As a result, Ms. Lewis was materially deprived of her ability to pursue her education at Utah State, in violation of Title IX.

97.     More specifically, Utah State violated Ms. Lewis's rights protected under Title IX by:

13

a.   Failing to take action to protect Ms. Lewis and other female students, despite knowledge of a need to supervise, discipline, warn, or take other corrective action to prevent future sexual assault, including rape, by Green;

b.   Allowing Green to remain a student at Utah State and a member of the football team, or alternatively, being deliberately indifferent to Green's conduct, despite repeated reports of sexual assault;

c.   Failing to enforce its own policies and requirements for students and student athletes, or alternatively, being deliberately indifferent to the enforcement thereof;

d.   Failing to warn students, including Ms. Lewis, of the known danger of sexual assault posed by Green;

e.   Posting only positive information about Green on its websites and failing to post critical safety information concerning Green, despite knowledge of the dangers posed by Green, or alternatively, being deliberately indifferent thereto;

f.   Creating a climate and culture that tolerated sexual assault and other misconduct by Utah State students and student athletes generally, and Green specifically, or alternatively, being deliberately indifferent thereto;

g.   Actively facilitating Green's presence in Logan and on the Utah State campus by granting and renewing Green's athletic scholarships.

h.   Actively facilitating Green's ability to persuade female students at Utah State to trust him due to his status as a student at Utah State and member of the Utah State Football Team and by failing to revoke such status despite repeated

allegations from multiple different victims of sexual assault by Green, or, alternatively, being deliberately indifferent thereto.

i.  Enacting and perpetuating an official policy or custom of deliberate indifference toward providing adequate training or guidance obviously necessary for implementation of the specific programs and policies of the recipient, or being deliberately indifferent thereto.

j.  Failing to implement or enforce policies and procedures to ensure compliance with Title IX, or alternatively, being deliberately indifferent thereto;

k.  Failing to take appropriate action against Green for misconduct in violation of its own Student Code and Athlete Handbook, or alternatively, being deliberately indifferent thereto;

l.  Failing to take reasonable measures to investigate and verify the several reports of sexual assault by Green; and

m.  Through other actions, inactions, and deliberate indifference.

98.     Utah State's actions, inaction, and deliberate indifference subjected Ms. Lewis and others to harassment and discrimination, including sexual assault and rape.

99.     By its actions and inaction after Ms. Lewis was raped, Utah State acted with deliberate indifference to the rights of Ms. Lewis to a safe and secure educational environment, thus materially impairing Ms. Lewis's ability to pursue her education at Utah State, in violation of Title IX.

100.    Utah State's actions, inactions, and deliberate indifference subjected Ms. Lewis to further discrimination and harassment, including, but not limited to, the University's inappropriate response to her sexual assault and rape.

101.    More specifically, Utah State violated Title IX after the sexual assault and rape of Ms. Lewis by:

> a.   Failing to provide or offer meaningful health or psychological services to Ms. Lewis after she was sexually assaulted and raped, or alternatively, being deliberately indifferent thereto;
>
> b.   Failing to provide Ms. Lewis with academic assistance and services after she had been raped, or alternatively, being deliberately indifferent thereto;
>
> c.   Failing to provide, offer, recommend, or coordinate adequate counseling to Ms. Lewis after she had been raped, or alternatively, being deliberately indifferent thereto;
>
> d.   Failing to take reasonable measures to investigate and verify the reports of sexual assault and rape of Ms. Lewis and other victims of Green, after multiple reports of sexual violence perpetrated by Green, or otherwise being deliberately indifferent thereto;
>
> e.   Failing to implement policies and procedures to ensure compliance with Title IX, or, alternatively, being deliberately indifferent thereto;
>
> f.   Failing to warn students of the known danger of sexual assault posed by Green;
>
> g.   Refusing to enforce its own policies and requirements for students, or, alternatively, being deliberately indifferent to the enforcement thereof;
>
> h.   Refusing to enforce its own policies and requirements for athletes, or, alternatively, being deliberately indifferent to the enforcement thereof;

i. Allowing Green to remain a student at Utah State, or, alternatively, being deliberately indifferent thereto despite multiple allegations of sexual assault perpetrated Green.

j. Failing to take appropriate actions against Green for misconduct in violation of its own Student Code after multiple accusations of sexual assault against Green, or, in the alternative, being deliberately indifferent thereto;

k. Failing to take appropriate actions against Green for misconduct in violation of its own Athlete Handbook after multiple accusations of sexual assault against Green, or, in the alternative, being deliberately indifferent thereto;

l. Enacting and perpetuating an official policy or custom of deliberate indifference toward providing adequate training or guidance that is obviously necessary for implementation of the recipient's specific programs and policies;

m. Failing to inform Ms. Lewis of her right to obtain reasonable accommodations under Title IX or that she could continue her education at Utah State, or alternatively, being deliberately indifferent thereto; and

n. Through other actions, inactions, and deliberate indifference.

102.  As a direct and proximate result of Utah State's actions, inactions, and deliberate indifference, Ms. Lewis has suffered severe and ongoing injuries, damages, and losses for which she is entitled to be compensated, including but not limited to:

a. Past, present, and future pain and suffering, both physical and emotional;

b. Past, present, and future psychological trauma and impairment;

c. Expenses for past and future treatment and medical bills;

d.   Interference with continuing education and lost educational time;

e.   Impaired educational capacity;

f.   Impaired earning capacity;

g.   All relief that the Court deems fair and equitable, and;

h.   Attorney fees pursuant to 42 U.S.C. § 1988(b).

## SECOND CAUSE OF ACTION
**Violation of the Equal Protection Clause of the Fourteenth Amendment Pursuant to 42 U.S.C. Section 1983 *et seq*. against Utah State University and John and Jane Does**

103.   Plaintiffs reallege all preceding paragraphs as if fully set forth herein and incorporate the same by reference.

104.   Ms. Lewis has a clearly established right under the Equal Protection Clause of the Fourteenth Amendment to an educational environment free of sexual harassment, as well as a clearly established right to bodily integrity.

105.   Utah State and John and Jane Does, acting under color of law in their official capacities as employees of the State of Utah, and with knowledge of these established rights, violated Mr. Lewis' right to an educational environment free from sexual harassment and her right to bodily integrity.

106.   Ms. Lewis' rights were violated due to the sexual assault and rape perpetrated against her by Green, as well as by the deliberate indifference to the reports of sexual assault made against Green prior to the attack, including, but not limited to reports made by C.D. and V.G.

107.   Ms. Lewis' rights were also violated due to the continued deliberate indifference of Utah State and John and Jane Does after the assault perpetrated against Ms. Lewis, when – upon receiving multiple additional reports from students about Green's sexual assaults – Utah

18

State and John and Jane Does failed to take any action to remedy the risk, failed to remove Green from campus, and instead continued to facilitate Green's ability to continue to use his status as a student of Utah State and a member of the Utah State Football Team to garner trust from female students.

108.    Utah State and John and Jane Does' actions were undertaken pursuant to an expressly adopted policy, practice and/or custom.

109.    Ms. Lewis' rights were further violated when Utah State and John and Jane Does' failed to provide Ms. Lewis with adequate counseling and education assistance or accommodations to assist her in continuing her education at Utah State following the sexual assault and rape.

110.    In addition, Utah State and John and Jane Does were deliberately indifferent to the need to provide its employees proper and adequate training regarding their legal duty to avoid violating other students' rights.

111.    Utah State's failure to properly train its employees is evidenced by a pattern of similar constitutional violations perpetrated on other female students at Utah State by way of Utah State and John and Jane Does' failure to properly investigate and take remedial actions after reports of sexual assault were made against students other that Green.

112.    Utah State's failure to properly train its employees is also evidenced by way of Utah State and John and Jane Does' failure to properly investigate and take remedial action after reports of sexual assault were made against Green.

113.    As a direct and proximate result of Utah State and John and Jane Does' actions, inactions and deliberate indifference, Ms. Lewis has suffered severe and ongoing injuries, damages, and losses for which she is entitled to be compensated, including but not limited to:

a.   Past, present and future pain and suffering, both physical and emotional;

b.   Past, present, and future psychological trauma and impairment;

c.   Medical bills and other expenses for past and future treatment;

d.   Interference with continuing education and lost educational time;

e.   Impaired education capacity;

f.   Impaired earning capacity ;

g.   All relief the Court deems fair and equitable; and;

h.   Attorney fees pursuant to 42 U.S.C. § 1988(b).

### THIRD CAUSE OF ACTION
**Violation of Ms. Lewis' Constitutionally Protected Due Process Rights Pursuant to 42
U.S.C. Section 1983 *et seq*. against Utah State University and John and Jane Does**

114.    Ms. Lewis realleges all preceding paragraphs as if fully set forth herein and

incorporates them by reference.

115.    Ms. Lewis has clearly established constitutional due process rights under the Fifth

and Fourteenth Amendments to the United States Constitution where her injuries arise from an

affirmatively created state danger by Utah State and John and Jane Does.

116.    Utah State and John and Jane Does, acting under color of law in their official

capacity as employees of the State of Utah, and with knowledge of these established right,

violated these rights.

117.    Utah State and John and Jane Does affirmatively created a danger and/or

otherwise increased Ms. Lewis' vulnerability to a danger by granting Green admission thereby

facilitating his presence on Campus.

118.    Utah State and John and Jane Does additionally created a danger and/or otherwise increased Ms. Lewis' vulnerability to a danger by granting Green a scholarship to attend Utah State, thereby further facilitating his presence on the Utah State campus and in Logan, Utah.

119.    Utah State and John and Jane Does further created a danger and/or otherwise increased Ms. Lewis' vulnerability to a danger by failing to properly investigate accusations made against Green after affirmatively facilitating his presence on the University campus and in Logan, Utah.

120.    Utah State and John and Jane Does further created a danger and/or otherwise increased Ms. Lewis' vulnerability to a danger by renewing and/or otherwise failing to revoke Green's scholarship and admission to Utah State at the beginning of each year, even in the face of repeated reports accusing Green of sexual assaults, and by facilitating Green's continued presence on campus and in Logan, Utah.

121.    At all relevant times, Ms. Lewis was a member of a limited and specifically definable group, namely female students at Utah State.

122.    Utah State and John and Jane Does conduct in actively facilitating a known sexual predator's presence on the University campus in Logan, Utah, and implicitly endorsing the behavior of a known sexual predator by failing to punish and affirmatively renewing his scholarship, put Ms. Lewis at substantial risk of serious, immediate and proximate harm.

123.    Due to the multiple accusations and evidence given to Utah State and John and Jane Does, this risk was obvious and known.

124.    Utah State and John and Jane Does acted recklessly and in conscious disregard of this risk by failing to investigate, punish, or otherwise take action to protect its female students.

125.    The conduct of Utah State and John and Jane Does, when viewed in sum, in shocking to the conscience.

126.    As a direct and proximate result of Utah State and John and Jane Does creation of danger and deliberate indifference to it, Ms. Lewis suffered a violation of her constitutional due process rights and the right to bodily integrity and an education environment free of sexual harassment.

127.    As a direct and proximate result of Utah State and John and Jane Does' actions, inactions and deliberate indifference, Ms. Lewis suffered severe and ongoing injuries, damages and losses for which she is entitled to be  compensated, including but not limited to:

    a.   Past, present and future pain and suffering, both physical and emotional;

    b.   Past, present, and future psychological trauma and impairment;

    c.   Medical bills and other expenses for past and future treatment;

    d.   Interference with continuing education and lost educational time;

    e.   Impaired education capacity;

    f.   Impaired earning capacity;

    g.   All relief the Court deems fair and equitable; and;

    h.   Attorney fees pursuant to 42 U.S.C. § 1988(b).

## FOURTH CAUSE OF ACTION
### Breach of Contract against Utah State University

128.    Ms. Lewis realleges all preceding paragraphs as if fully set forth herein and incorporates them by reference.

129.    The Student Code constitutes an agreement between Utah State University and tis students and contains the promise that Utah State will properly and appropriately respond to reports of sexual assault, violence, and harassment to ensure the safety of all students.

130.    Utah State breached these provisions by failing to initiate and/or follow procedures and guidelines as to the discipline of a sexually violent student-athlete who caused harm to Ms. Lewis.

131.    As a result of the contractual breach, Ms. Lewis was battered and sexually assaulted, endured physical and psychological trauma, medical bills and expenses, interference with continuing her education, an impaired educational capacity, and an impaired earning capacity.

132.    Ms. Lewis was harmed as a result of said acts and is entitled to damages in an amount to be established at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Lewis demands judgment against Utah State for the following damages:

A.    For economic damages in an amount to be determined at trial;

B.    For non-economic damages in an amount to be determined at trial;

C.    For punitive damages;

D.    For costs, interests, and attorney fees to the extent allowed by law; and

E.    For such other relief as the Court deems appropriate.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial on all issues so triable.

DATED this 1st day of November 2019.

**NELSON JONES, PLLC**


/s/ Nate N. Nelson
Nate N. Nelson

23
